EDDY *v.* NATIONWIDE INSURANCE COMPANY.

(No. CI-82-133—Decided April 12, 1983.)

Court of Common Pleas of
Paulding County.

*Messrs. Cook & Hyman* and *Mr. Norman E. Cook,* for plaintiff Joan Eddy.
*Messrs. Koch, Koch & Keister* and *Mr. Kenneth Koch,* for defendant.

HITCHCOCK, J. Plaintiff's motion for summary judgment presents a narrow question in the interpretation of a health care insurance policy.

On February 21, 1980, plaintiff signed an application for a major hospital/major medical insurance policy to be effective March 1, 1980, which was completely accepted by defendant Nationwide Insurance Company, which issued her policy No. 0107-0981 as a result. Between March 1, 1980 and April 1, 1980, plaintiff submitted claims for $2,276.63 which were paid. On January 18, 1982, defendant acted to rescind the policy, which action plaintiff contests.

The mentioned application contains a question, No. 1, to wit:

"Have you (or any of your dependents) been hospitalized, *consulted with or been treated by a physician* for any of the following (check yes or no):

| | "Yes | No |
|---|---|---|
| "Heart or Blood Disorders | | x |
| "Phlebitis/High Blood Pressure | | x |
| "Disease or Disorder of Tubes, Uterus, (Includes D & C) Ovaries, Testicles or Prostate | | x |
| "Cancer or Malignancy | | x |
| "Rheumatoid Arthritis/ Diabetes | | x |
| "Mental or Nervous Disorders | | x |
| "Kidney or Urinary Tract Disease | | x " |

(Emphasis added.)

Plaintiff checked all answers under "no." Defendant now maintains plaintiff did not answer the last question honestly. Plaintiff says she did, maintaining that she has never had any knowledge that she

1

ever suffered from any "kidney or *urinary tract disease*" (her emphasis). Plaintiff presents the affidavit of Dr. Jerome J. Ludwig, a urologist recommended by her family physician. Defendant presents the affidavit of her family physician, Dr. J. H. Cox. In pertinent part these affidavits are as follows:

Affidavit of Jerome J. Ludwig, M.D.

"That Mrs. Eddy was initially seen by me in June of 1979 with a history of hematuria. She was evaluated with an intravenous pyelogram taken at the Van Wert County Hospital on June 21, 1979, which showed her kidneys to be within normal limits. Subsequently, she underwent a cystoscopic examination in June of 1979 and it was found that the hematuria was secondary to a chronic infectious process in her bladder. She was followed for the next couple of years and did require some bedtime medication. In August of 1981, she again had an infection and had a cystoscopy, and again this just showed infectious changes. To my knowledge, I have not seen Mrs. Eddy since August of 1981.

"* * *

"5. That on February 19, 1980, Mrs. Joan Eddy did not suffer from a urinary tract disease and that on February 19, 1980, she had not ever been hospitalized or treated by this affiant for a urinary tract disease."

Affidavit of J. H. Cox, M.D.

"I rendered medical care to the plaintiff, Joan Eddy, in this case from 1975 until September 15, 1981. On written authorization from my patient, I released the following information to Nationwide Insurance:

"That on May 22, 1979, I treated Joan Eddy for acute hemorrhagenic cystitis. That her condition was diagnosed as a bladder problem with bleeding. My diagnosis was also urethial stenosis.

"That I advised my patient, Joan Eddy, of my diagnosis. In my opinion, she would have known prior to February 19,

1980, that I had treated her for a urinary tract disease. On May, 1979, her urinalysis showed an excess of blood and albumen. A microanalysis of the urine specimen indicated that it contained red blood cells. I prescribed the drug Septra at that time. On June 13, 1979, I treated her bladder problems. I am certain that she was aware of the nature of my treatment.

"On June 19, 1979, I referred Joan Eddy to Dr. Jerome J. Ludwig, a specialist in the field of kidney and urinary tract diseases.

"I prescribed the drugs Septra, Bactrim and Macrodantin, all of which are antibiotics and are used for treatment of urinary tract infections.

"Dr. Ludwig treated Joan Eddy in June of 1979 for symptoms or complaints of recurrent urinary tract infection. His diagnosis was urethritis and trigonitis.

"In my opinion, prior to February 19, 1980, Joan Eddy knew that she had been treated for a disorder of the urinary tract."

These physicians, whose qualifications are not questioned, seem to have slightly different notions as to the precise definition of the word "disease."

Obviously, whatever she suffered from prior to February 19, 1980 Dr. Ludwig cannot call a "disease." Neither does Dr. Cox, accept as a matter of opinion that she must have known it. Still, in positive terms he used only the words — "cystitis," "bladder problem with bleeding," "urethrial stenosis," "[her urine] * * * [had] an excess of blood and albumen," "[her urine] contained red blood cells," "urethritis," and "trigonitis" — and gave his opinion that she "knew she had been treated for a *disorder* of the urinary tract." (Emphasis added.)

Without citing any authority defendant's counsel asserts: "Infection is a disease diagnosis. Plaintiff had an ongoing urinary tract disease. Even Hematuria is a disease."

The first paragraph of the syllabus of *Jenkins* v. *Metropolitan Life Ins. Co.* (1961), 171 Ohio St. 557 [15 O.O.2d 14], reads:

"An insurer may establish an answer to an interrogatory by an applicant for life insurance as a bar to recovery upon a policy by clearly proving that (1) in giving such answer, the applicant wilfully gave a false answer (2) such answer was made fraudulently (3) but for such answer the policy would not have been issued and (4) neither the insurer nor its agent had any knowledge of the falsity of such answer. (Section 3911.06, Revised Code, construed and applied.)"

In the context of the circumstances just recited this court finds the pertinent questions to be:

1. What did plaintiff understand was meant by the words "Kidney or Urinary Tract Disease?"

2. Was this understanding one which many reasonably prudent persons would have had in the circumstances?

3. Was she ever in fact told by any physicians that she was suffering from any specific disease?

4. Although "disease" may include infection, does "infection" always have as an equivalent meaning the word "disease?"

For help in considering these questions the court first turned to Words and Phrases and found only two Ohio cases dealing with the word "disease" and one with the word "infection."[1]

The court then consulted Blakiston's Gould Medical Dictionary (4 Ed. 1979) and found the following definitions:

"disease

"1. The failure of the adaptive mechanisms of an organism to counteract adequately the stimuli or stresses to which it is subject, resulting in a disturbance in function or structure of any part, organ, or system of the body. A response to injury; sickness or illness. 2. A specific entity which is the sum total of the numerous expressions of one or more pathological processes. The cause of a disease entity is represented by the cause of the basic pathological process in combination with important secondary causative factors."

"infection

"1. The invasion of a host by organisms such as bacteria, fungi, viruses, protozoa, helminths, or insects, with or without manifest disease. Com-

---

[1] The "disease" cases were *Troietto* v. *G. H. Hammond Co.* (C.A. 6, 1940), 110 F. 2d 135, and *Malone* v. *Indus. Comm.* (1942), 140 Ohio St. 292 [23 O.O. 496].

*Troietto* held at 137 that "pork that is infested with trichinella is diseased within the meaning of the Ohio Pure Foods Law." *Malone,* at 296, held, in a workmen's compensation case that:

"* * * the distinction of 'injury' from 'occupational disease,' as made both in the constitutional provision and statutory enactment, warrants the conclusion that 'disease' is not included in the term 'injury,' and that compensation may be awarded for incapacity by reason of disease only where it is shown that the disease was caused by or is the result or consequence of a compensable injury. * * *"

The Ohio case located under "infection" was *Burns* v. *Employers Liability Assn.* (1937), 26 Ohio Law Abs. 52, reversed (1938), 134 Ohio St. 222. The Court of Appeals for Cuyahoga County, in an action to recover on an accident and life insurance policy, was reversed on its holding that: "Death resulting from the ravaging of the internal body by amoebae in infected hotel water consumed by the deceased comes within the provision of a policy insuring against bodily injuries sustained 'through accidental means.' " Plaintiff's decedent was the victim of an epidemic of amoebic dysentery occasioned a great number of patrons of two Chicago hotels in 1933 and 1934 attributed to defective plumbing. The court finds these cases of no help for its present problem.

This search did reveal *Life Ins. Co.* v. *Francisco* (1873), 84 U.S. 672, a case which held it was proper for the jury to determine if an "ailment might be so serious as to constitute disease." *Id.* at 676.

pare *contagion, infestation.* 2. The pathologic state caused in the host by such organisms."

From these definitions approved by a distinguished editorial board of four physicians and one doctor of science it would appear that one can be infected without manifesting disease or suffering from some specific entity which in its entirety need exist before one is said to suffer from a particular disease.

Consequently, if Eddy's urologist declares that her condition observed by him in 1979 did not amount to any kidney disease or disease of the urinary tract, how could she believe that she was suffering from a "disease?" What Dr. Cox actually told her is not in evidence. What is in evidence to date is insufficient to enable this court to find that plaintiff's proof leaves no "genuine issue of material fact" as to whether plaintiff had "consulted with or been treated by a physician for "Kidney or Urinary Tract Disease," as Civ. R. 56 requires, to establish plaintiff's claim as a matter of law. Consequently, plaintiff's motion for summary judgment is overruled.

*Motion overruled.*